IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

RICHARD WOLF

      Plaintiff,

v.

MEADOW HILLS III CONDOMINIUM ASSOCIATION and CAROL WILLIAMS and WENDY WIEGLER and STEPHANE DUPONT and WINZENBURG, LEFF, PURVIS & PAYNE LLP and TAMMY ALCOCK and ALCOCK LAW GROUP PC and MAXIMUM PROPERTY MANAGEMENT LLC

      Defendant.

## COMPLAINT

This complaint arises from "Eggshell with Equity" and an allegation of bad faith, highly profitable, efforts to consume a housing estate by unlawfully foreclosing, evicting and collecting assets through a predatory abuse of statutory lien power primarily affecting vulnerable Common Community homeowners.

The Plaintiff, Richard Wolf, by and through his attorneys, Robert R. Harper and Mason Simpson, at Robinson and Henry P.C, complain against Meadow Hills III Condominium Association; Carol Williams; Winzenburg, Leff, Purvis & Payne LLP; Wendy Weigler; ; Stephane Dupont; Alcock Law Group PC; Tammy Alcock; and Maximum Property Management ("Maximum"), collectively "Defendants" and states as follows:

### NATURE OF ACTION

1. This is an action is being brought under Breach of Fiduciary Duty, Good Faith and Fair Dealing, Acts of Discrimination under 42 U.S.C. §§ 3604(f)(2), 3604(f)(3)(A)3604(f)(3)(B), 42 U.S.C. § 12181 et seq, 42 U.S.C. § 1985(3); Unjust Enrichment; Selective Enforcement; Direct and Vicarious Liability for hostile environment (under 24 C.F.R. § 100.600), Vicarious liability through Respondeat Superior and Direct Negligence.

### PARTIES

2. Plaintiff, Richard Wolf ("Wolf") is a resident of Nevada, located at 1591 South Dandelion Street, Apt 7, Pahrump, NV 89048.

3. Defendant Meadow Hills III Condominium Association ("MHIII" or alternatively "Meadow Hills") is a nonprofit organization in good standing to conduct business in the State of Colorado, with a principle office located at 19751 East Mainstreet, Ste 275, Parker, Colorado 80138, and has a registered agent The Colorado Property Management Specialists, Inc., located at the same address as Defendant.

4. Defendant Carol Williams ("Williams") was the President of Defendant Meadow Hills III Condominium Association during the alleged offenses and is located at 4044 South Carson Street, Unit H, Aurora, Colorado 80014.

5. Defendant Winzenburg, Leff, Purvis & Payne LLP ("WLPP") is a law firm representing Meadow Hills III Condominium Association, located at 8020 Shaffer Parkway, Suite 300, Littleton, Colorado 80127.

6. Defendant Wendy Weigler ("Weigler") is an attorney in Colorado at Winzenburg, Leff, Purvis & Payne, LLP

7. Defendant Stephane Dupont ("Dupont") was an attorney in Colorado at at Winzenburg, Leff, Purvis & Payne, LLP during the alleged offenses, and is now with The Dupont Law Firm at 11479 S Pine Drive, Parker, CO 80134, United States, with which he is a registered agent at that address.

8. Defendant Alcock Law Group PC ("Alcock Law") is a law firm with a registered agent of Tammy Alcock located at 19751 East Mainstreet, Suite 225, Parker, Colorado 80138. This company has a registered agent Tammy Alcock at the same address.

9. Defendant Tammy Alcock ("Alcock") is an attorney at Alcock Law Group, in Colorado located at 19751 East Mainstreet, Suite 225, Parker, Colorado 80138.

10. Defendant Maximum Property Management is a registered trade name owned by Maximum Management at 2851 S. Parker Road Ste 840 Aurora, Colorado 80014 ; registered agent is Tammy Hall at the same address.

## <u>JURISDICTION</u>

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 due to all parties being from different states and the amount in controversy exceeding $75,000.00.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Defendants are subject to the laws of Colorado in this matter.

## FACTUAL BACKROUND

13. Plaintiff Wolf was (and is) physically and mentally disabled as defined by the Fair Housing Act, 42 U.S.C. §3602 (h).

14. Plaintiff Wolf was declared physically and mentally disabled by the Federal Social Security Agency effective October 2010.

15. Plaintiff Wolf has since relied on disability (SSDI) income.

16. Plaintiff Wolf purchased his interest in the property located at 4094 South Carson Street, #C, Aurora, CO 80014, in the incorporated city of Aurora and the county of Arapahoe, regulated by Defendant MHIII as a HOA covenant community subject to CCIOA laws, on or around July 18, 2013.

17. Plaintiff Wolf resided at that property from the day it was purchased to the day it was sold.

18. Plaintiff Wolf was a member of MHIII and was obligated to CCIOA statutes (CRS 38-33.3-101 et seq, ) and the governance declarations, rules, and policies as defined by the booking:

> CONDOMINIUM UNIT 4094-C, IN CONDOMINIUM BUILDING 3, MEADOW HILLS III CONDOMINIUMS, ACCORDING TO THE CONDOMINIUM MAP THEREOF RECORDED ON APRIL 25,1984 IN BOOK 74 AT PAGE 37, IN THE RECORDS OF THE OFFICE OF THE CLERK AND RECORDER OF THE COUNTY OF ARAPAHOE, COLORADO AND AS DEFINED AND DESCRIBED IN THE CONDOMINIUM DECLARATION FOR MEADOW HILLS III CONDOMINIUMS, RECORDED FEBRUARY 28, 1984 IN BOOK 4097 AT PAGE 57, IN SAID RECORDS, COUNTY OF ARAPAHOE, STATE OF COLORADO."

19. Under CCIOA statutes Defendant MHIII must maintain a "ledger" for that property of which assessments may be entered as a debt. As stated in CCIOA stature (CRS 38-33.3-316(1)):

> (1) The association, if such association is incorporated or organized as a limited liability company, has a statutory lien on a unit for any assessment levied against that unit or fines imposed against its unit owner. Unless the declaration otherwise provides, fees, charges, late charges, attorney fees, fines, and interest charged pursuant to section 38-33.3-302 (1) (j), (1) (k), and (1) (l), section 38-33.3-313 (6), and section 38-33.3-315 (2) are enforceable as assessments under this article. The amount of the lien shall include all those items set forth in this section from the time such items become due. If an assessment is payable in installments, each

installment is a lien from the time it becomes due, including the due date set by any valid association's acceleration of installment obligations.

20. Under the mentioned statutes, the referenced Ledger establishes a monthly self-perfecting Assessment Lien against the property Plaintiff Wolf owns.

21. CCIOA CRS 38-33.3-123 is a statute that establishes limitations of what and how collections can be enforced or which and when dues may be placed on the Ledger for liens:

   a. Generally, if collecting unpaid dues, the costs for collection and attorney fees Costs of attorney fee may be "required" (without needing a civil action). These types of fees may be automatically assessed.
   b. Generally, if a dispute involves collecting dues to owner (or association) stemming from governance violations, the owner or HOA "may seek" costs and legal fees (without needing civil action).
   c. Generally, if a dispute for assessments or monies dues from either the HOA or the Owner becomes a civil matter in a court, costs and attorney fees must be awarded to a "prevailing party" ( a civil action requires that a judgement rendered) before they may be placed on a ledger and lien.

22. Additionally, the HOA governing documents are clear on how to manage, collect or seek civil action for assessments disputes

23. The HOA covenants and Declarations similarly state the same basic concept:
   19. 4 Enforcement.
   Enforcement of the covenants, conditions, restrictions, easement, reservations, rights-of-way, liens, charges and other provisions, contained in this Declaration, the Articles of Incorporation, By-Laws, or rules and regulations of the Association, as amended, may be by any proceeding at law or in equity against any person or persons violating or attempting to violate any such provision. T'he Association and any aggrieved owner shall have the right to institute, Maintain and/or prosecute any such proceedings, and the Association shall further: have the right to levy and collect fines for the violation of any provision of any of the aforesaid documents in any action instituted or maintained under this Section1 the prevailing party shall be entitled to recover it's costs and reasonable attorney fees incurred pursuant thereto, as well as any and all other sums awarded by the Court.

24. On or around February 23, 2016, MHIII placed an Assessment Lien on Plaintiff's property for unpaid assessments and charges totaling One Thousand Six Hundred Fifty-Eight dollars and 67/100 cents ($1,658.67).

25. Since statutory assessment liens are self-perfecting, and generally change monthly, Plaintiff requested the lien balance amount multiple times from Defendants in compliance with CRS (32-33.3-316(8) and demanded a furnished response under that statute as stated:

> The association shall furnish to a unit owner or such unit owner's designed or to a holder of a security interest or its designee upon written request, delivered personally or by certified mail, first-class postage prepaid, return receipt, to the association's registered agent, a written statement setting forth the amount of unpaid assessments currently levied against such owner's unit.

> The statement shall be furnished within fourteen calendar days after receipt of the request and is binding on the association, the executive board, and every unit owner.

26. As outlined, MHIII is obligated to reply to requests for unpaid assessments from Plaintiff request, in person or by certified mail, within 14 days.

27. The statute cited further states:

> If no statement is furnished to the unit owner or holder of a security interest or his or her designee, delivered personally or by certified mail, first-class postage prepaid, return receipt requested, to the inquiring party, then the association shall have no right to assert a lien upon the unit for unpaid assessments which were due as of the date of the request.

28. Of the three documented certified requests under the above referenced statute, and after good faith opportunities to cure the refusal to respond, none were answered as required.

29. By the plain language of the statutory terms for assessment liens, defendant MHIII had no right to assert any lien or unpaid assessment before the dates of request.

30. CCIOA has a requirement for (9) policies to be adopted: §38-33.3-209.5. Responsible governance policies - due process for imposition of fines

31. MHIII adopted those policies around February, 2013 ("The Statutory Policies")

32. The Statutory Policy referred to as "collection policy and procedure" requires defendant MHIII to make a good faith effort to enter into a payment plan.

33. After efforts failed, Plaintiff Wolf underwent major surgery and requested a short accommodation in the form of an extension to the deadline for payment plan negotiations, which was refused.

34. MHIII through WLPP notified Wolf that all contact for all matters, including disputes, maintenance, dues payments, and such be handled through WLPP.

35. Defendant Wolf made three unsuccessful and documented efforts to enter into payment plans under the Statutory Policy.

36. Defendant MHIII commenced action in Arapahoe County Court for Money damages against Defendant on June 9, 2016, seeking amounts owed from the past due assessment lien. *See* 2016C039616.

37. Plaintiff Wolf answered with a counterclaim and affirmative defenses including bring suit for $5,700 loss which caused the lien delinquency and resulting dispute.

38. Wolf disclosed protected status ("SSDI" disability income) while applying for "pro forma" waiver of fees to answer.

39. MHIII and WLPP discovered the protected status and Wolfs Disability income, and apposed the motion.

40. Prior to this, MHIII had known that Plaintiff had mental and physical disabilities through conversations among board members.

41. Billing Records provided during a statutory records request around April 2019 revealed that a employee named "SRD" (allegedly "Stephane Robert Dupont") began conspiring with Defendant Maximum on foreclosure options, after discovery of Plaintiff Wolfs protected status about June 29 2016.

42. That same discovered billing statement revealed that Defendant Dupont billed for efforts to determine equity for a possible foreclosure, on September 15 2016 .

43. Trial in the money damages case was set for November 30, 2016.

44. At the recommendation of defendant MHII's Counsel Defendant DuPont, Defendants held a vote regarding whether to foreclose on Plaintiff's property on September 28, 2016, in lieu of continuing with the money damages case.

45. At the September 28, 2016 board meeting, held by Defendant Maximum, Defendant MHII Voted to proceed with the trial for money damages set for November 30, 2016.

46. Prior to this, MHIII had known that Plaintiff had mental and/or physical disabilities through conversations among board members.

47. At this time, Plaintiff was also a board member.

48. Information shows Defendant MHIII, Defendant Williams, Defendant WLPP, Defendant Dupont, and Defendant Maximum, stereotyped disabled people as judgement proof and uncollectable.

49. Billing Records provided during a statutory records request in 2019 (above referenced) around disclose that thereafter, Meadow Hills' Counsel DuPont convinced Defendants to foreclose on Plaintiff's property.

50. According to those referenced billing records, on November 4, 2016, Mr. Dupont had a telephone conference with the MHIII Board Members and community association manager and advised to proceed with judicial foreclosure.

51. Those same records show that an authorization form (per CCIOA and Policy) drafted by Defendant Dupont, was sent by Defendant WLPP

52. In or around November 4, 2016 the authorization and resolution was signed by Defendant Williams after an offensive vote by all board members, and a hosted meeting at defendant Maximum's location.

53. Upon further investigation, Mr. Dupont's law firm, Winzenburg, Leff, Purvis & Payne, LLP, published and blog which stated, "Five Delinquent Homeowners You Will Meet in Court (and One You Won't).

54. In that blog, it stated that a judgement proof owner is "retired and/or on disability with no plans to ever work again."

55. The blog further advised exclusively to foreclose on disabled person's home if that person "had equity in that home. "

56. To that effect, Mr. Dupont along with every board member of Meadow Hills, conspired to discriminate against Plaintiff due to his disability. \

57. Due to Plaintiffs' disability and because of the stereotype of disabled/elderly, Defendant sued to foreclosed on his house.

58. Plaintiff asserted his civil rights by filing multiple charges of discrimination.

59. The charges became a motive for retaliation, coercion, refusal to reasonably accommodate, and hostility.

60. Due to Plaintiff's disability and because of the published stereotype of being disabled/elderly, Defendants filed suit to evict Plaintiff from his home.

61. During this time, Defendants had known about Plaintiff's disability status and labeled him "judgement proof" based on his disability.

62. Throughout this time, Plaintiff attempted to enter into payment plans, lump sum payments as well as stipulated solutions.

63. All attempts were unsuccessful and rejected by MHIII and Defendants Williams, Alcock, Dupont and Weigler.

64. Defendants did not explore or offer alternate avenues for Plaintiff to pay his HOA dues.

65. Plaintiff Wolf suffered multiple events of failed health, including Cardiac arrests, Infection, and major depression.

66. These events caused frequent and prolonged hospitalization on multiple occasions.

67. One occasion ( a "flesh eating" form of MRSA wound on left foot) led to about two months isolated stay in a hospital, from which Defendant Wolf was strictly isolated, sedated, often psychotic and catatonic, and completely unable to respond in any imaginable way .

68. After multiple surgeries, and with a very delicate surgical skin graft, Wolf was released and returned home on the condition that he gain "less than 20 steps" access to his vehicle for needed treatment.

69. The order was required until early January of 2018,

70. The orders resulted in an urgent, immediate request for parking accommodation, with doctor notes and explanation, about October 4 2017 to meet the doctor's orders.

71. Under Section IV of the MHIII registered declarations and covenants, MHII has the right to "assign" exclusive use parking to any unit owner:

> (d) The right but not the obligation of the Association, from time to time, to assign specific parking spaces or areas, other than any parking space (s) . designated on any Condominium Map for use as a Limited Common element by a specific Condominium Unit, for the exclusive use of the owners of particular Condominium Units or particular Condominium Building

72. Although "granted" 6 weeks later, and after repeated requests through WLPP, and Dupont to Maximum and MHIII with appeals to accommodate, there was no accommodation until early January, more than two months later.

73. Although "granted" 6 weeks later, and after repeated requests through WLPP, and Dupont to Maximum and MHIII with appeals to accommodate.

74. There was no accommodation until early January, more than two months later.

75. As mentioned, this was about the time accommodation was no longer necessary.

76. Wolf, on crutches and without a provided accommodation, was required to park at other end of the parking lot, and traverse across icy pavement on his crutches.

77. On one such occasion, Wolf fell on ice and injured the sensitive skin graft.

78. After efforts to save the foot over the next year, and because of the re-infection resulting, Wolf suffered permanent loss of large Toe (amputated January 2019) and major part of foot ( 1st metatarsal amputation June 2019 ).

79. Wolf must permanently use a special brace to facilitate mobility.

80. Wolf remains permanently disfigured and unable to walk normally.

81. Article XI of the MHIII declarations titled "restrictive covenants" , section 11 empowers and obligates MHIII and their agents to act when a hostile environment is created by 3rd parties and other members:

> 11.11 Nuisances.
> no nuisance shall be allowed on tbe Project, nor any use or practice which is the source of annoyance to residents or which interferes with the peaceful enjoyment or possession and proper use of the Project by its residents. As used herein, the tera •nuisance• shall not include any activities of Declarant in regard to the development and construction of the Project….
>
> All valid laws, ordinances and regulations of all governmental bodies having jurisdiction over the Project, or any portion thereof, shall be observed.

82. After the request for accommodation was granted, MHIII was informed of multiple acts of retaliation and hostility by a neighbor ("Becky L") known to harass Wolf due to his "faked" disability.

83. This neighbor defiantly parked in Wolfs reserved space, knocked on door accusing him of faking injury, picked fights, and confronted Wolf regularly .

84. After police were called in responded, warning Becky L to stay away, Three tires were slashed on Wolfs vehicle.

85. Defendant MHIII was again notified of the hostility and retaliation and refused to cure the nuisance.

86. Additionally, Wolf's Motorcycle was damaged and had to be towed. repaired, and stored by his dealership to prevent further damage.

87. The sign was requested to be removed to avoid further hostility.

88. Similar to Becky L, A board member involved with the eviction, discovered an took keys left in a mailbox belonging to Wolf, within 50 feet of Wolf while he was trying to find them on the sidewalk. This board member (Steven Held) , refused to answer posted "lost

keys" notices, did not post "found keys" notices , and refused to turn keys over to management.

89. MHIII, Maximum, and WLPP all knew Held had the keys, yet refused to cure the urgent requests to return the keys until police were notified and finally retrieve the keys.

90. There is no duty right or obligation under any governance for MHIII to withhold owner's possessions for any reason whatsoever.

91. The "Held hostility" caused missed appointments and treatments for injury and disability.

92. While amputation surgery was scheduled, and with similar doctors orders , another request for exclusive use parking was submitted and granted.

93. An exclusive use sign was promised within 14 days.

94. Surgery was cancelled after the promised date passed with no sign installed efforts to resolve were met with hostility by MHIII and defendant Alcock.

95. Hostility continued with false claims that the sign was installed.

96. Hostility continued after witnesses countered the claim and proved the sign was never installed

97. Hostility continued after a revised claim that the "installed" sign was being stolen.

98. With a pressing surgery interrupted, Wolf advised that either a stolen sign OR a refusal to place a sign for accommodation is a act of hostility

99. MHIII and Aclock were advised that a hostile environment existed regardless of the claimed scenarios and that a police report was created for the issue

100. MHIII and Alcock refused to cure the hostility or work with police to stop the "thefts" .

101. The extreme distress encountered with MHIII and it's agents lead to humiliation and harassment.

102. The extreme distress encountered with MHIII and it's agents lead to extreme and continuing emotional distress.

103. As a result of Defendants' actions, Plaintiff suffered injuries as he lost his house based on his disabilities and the facts listed in paragraphs 13-103.

### I. BREACH OF FUDICIARY DUTY
(Against MHIII and Carol Williams)

104. Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

105. In the context of cooperatives and condominiums, shareholders and unit owners invest their trust in board members by casting proxies and ballots in their favor at the annual meeting.

106. Recognizing that a corporation's board members serve in a position of trust, every state's corporation law imposes a fiduciary duty on the corporation's board of directors, requiring them to act in the best interest of the corporation and it's constituents.

107. As a result of this, duly elected board members have the power to enact and enforce house rules which profoundly impact residents' daily lives.

108. Generally a Breach of Fiduciary Duty is broken down into three broad categories of misconduct; Use of the board position to derive profit or otherwise promote personal interest at the expense of the association of its constituent shareholders and unit owners; use of the board position as a forum for prosecuting personal vendettas against particular shareholders or unit owners; and manifestation of favoritism among shareholders or unit owners.

109. Prosecution of vendettas against shareholders is also a breach of the fiduciary duty.

110. It violates the board member's obligation to manifest utmost good faith towards his wards.

111. As previously indicated, this duty requires fair and equal treatment of all shareholders or unit owners.

112. Such an abuse of power violates the fairness aspect of the obligation

113. As majority managing Member of the Company, Defendant MHIII and Carol Williams owed a fiduciary duty to the Company to act in the best interests of MHIII and it's constitutes, including Plaintiff pursuant to Colorado Revised Statutes, § 7-80-404 and § 7-80-108.

114. Defendant MHIII and Carol Williams violated their fiduciary duty to the Company and its constituents, including Plaintiff, when they choose to foreclose on Plaintiff's property based on his disability.

115. Defendant MHIII and Carol Williams violated their fiduciary duty to the Company and its constituents, including Plaintiff, when they choose not to modify or accommodate Plaintiff in his attempts to pay off the HOA fees.

116. Defendant MHIII and Carol Williams further violated their fiduciary duty to the Company and its constituents, by failing to provide Plaintiff with total lien assessment, pursuant to their own policies and covenants when requested by Plaintiff.

117. Defendant MHIII and Carol Williams had a personal vendetta against Plaintiff because of his disability.

118. In this regard, Defendant MHIII and Carol Williams violated their duty of good faith and fair dealing in violation of C.R.S. § 7-80-404.

119. Manifestation of favoritism towards selected shareholders or unit owners, to the detriment of others, constitutes a breach of the fiduciary obligation in the sense that it violates the equality aspect of a board member's duty of utmost good faith towards his shareholders or unit owners.

120. As a direct and proximate result of Defendant MHIII and Carol Williams' breach of his fiduciary obligations to the Company, and its constituents, Plaintiff has been damaged in an amount to be determined at trial.

121. As a result of Defendants' actions, Plaintiff suffered injuries as he lost his house based on his disabilities and the facts listed in paragraphs 104-121.

## II. VIOLATION OF THE FAIR HOUSING ACT
### (Against All Defendants)

122. Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

123. In 1988, Congress dramatically expanded the scope and coverage of the Fair Housing Act. Entitled the Fair Housing Amendments Act of 1988 ("FHAA"), the new law included prohibitions against discrimination on the basis of handicap in the provision of housing.

124. The Fair Housing Act protects people from discrimination when they are renting or buying a home, getting a mortgage, seeking housing assistance, or engaging in other housing-related activities.

125. The Act specifically expanded the definition of "discrimination" to impose an affirmative obligation on property holders, including condominium associations, to grant residents' requests to make accommodations and modifications at the residents' expense that are reasonable and necessary to ensure their equal opportunity to use and enjoy a dwelling.

126. Congress passed the FHAA specifically to eliminate accessibility barriers that historically have operated to deny fair housing to disabled persons and isolate them from the community at large.

127. By enacting these amendments, Congress made "a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream." (June 17, 1988).

128. Congress recognized that the overt refusal to rent or sell housing was only one of the many reasons disabled people could not find necessary housing; the denial of reasonable modifications and accommodations poses just as significant an obstacle.

129. Acts that have the effect of causing discrimination can be just as devastating as intentional discrimination." *Id.* at 25. Congress took particular note of the lamentable fact that "people who use wheelchairs have been denied the right to build simple ramps. . . ." *Id.*

130. Since the enactment of the 1988 amendments to the Fair Housing Act, scores of courts across the country have held that landlords, homeowners' associations, housing developers, and condominium associations violate the Fair Housing Act when they deny reasonable accommodations and/or reasonable modifications for persons with disabilities.

131. The Fair Housing Act prohibits the harassment of person because of race, color, religion, sex, disability, familial status, or national origin.

132. The Fair Housing Act prohibits threating, coercing, intimidating or interfering with anyone exercising a fair housing right or assisting others who exercise that right.

133. The Fair Housing Act also requires Housing providers to make reasonable accommodations and allow reasonable modifications that may be necessary to allow persons with disabilities to enjoy their housing.

134. A "reasonable accommodation" is a change, exception, or adjustment to a rule, policy, practice, or service that may be necessary for a person with a disability to have an equal opportunity to use and enjoy a dwelling, including public and common use spaces.

135. Since rules, policies, practices, and services may have a different effect on persons with disabilities than on other persons, treating persons with disabilities exactly the same as others will sometimes deny them an equal opportunity to use and enjoy a dwelling.

136. The Act makes it unlawful to refuse to make reasonable accommodations to rules, policies, practices, or services when such accommodations may be necessary to afford persons with disabilities an equal opportunity to use and enjoy a dwelling.

137. The practices of the Defendants described above constitute:

> a. pattern or practice of resistance to the full enjoyment of rights granted by the **Fair Housing Act**, pursuant to 42 U.S.C.A. § 3614(a); and

> b. A denial to a group of persons of rights granted by the **Fair Housing Act**, which denial raises an issue of general public importance, pursuant to 42 U.S.C.A. § 3614(a).

138. Bona fide house owners been the victims of the Defendant's discriminatory housing practices are aggrieved persons as defined in 42 U.S.C.A. § 3602(i), and have suffered damages as a result of the Defendant's conduct described above.

139. Bona fide house owners been the victims of the Defendant's discriminatory housing practices are aggrieved persons as defined in 42 U.S.C.A. § 3602(i), and have suffered damages as a result of the Defendant's conduct described above.

140. The Defendants conduct described above was intentional, willful, and/or taken in disregard for the rights of others.

141. Defendants did not explore or offer any alternate avenues for Plaintiff to pay his HOA dues.

142. Defendants turned down several alternative proposals and offers to enter payment plans or settlement offers.

143. Other owners were given alternatives to pay lien assessments without foreclosure.

144. Yet, Plaintiff was not afforded with this opportunity to resolve his matter as to avoid foreclosure.

145. The foregoing actions of Defendants constitute a refusal to permit, at the expense of the Defendants, reasonable modifications of existing premises occupied or to be occupied by plaintiffs when such modifications may be necessary to afford such person full enjoyment of the premises, in violation of 42 U.S.C. §§ 3604(f)(2), 3604(f)(3)(A).

146. The foregoing actions of defendants constitute a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling, in violation of 42 U.S.C. §§ 3604(f)(2), 3604(f)(3)(B).

147. As a result of Defendants' violations of the Fair Housing Act, Plaintiff has been injured, as detailed above in paragraphs 122-147.

### III. VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990
(Against all Defendants)

148. Plaintiff repeats the allegation of all of the above paragraphs as if fully set forth herein.

149. The Defendants' actions and practices described above violate Title III of the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. § 12181 et seq.

150. In particular, the Defendants' actions and practices described above constitute unlawful discrimination under 42 U.S.C. § 12182(a), in that Defendants have discriminated against

Plaintiff, a handicapped and disabled resident of their properties, on the basis of disability, with regard to the full and equal enjoyment of the Defendants' goods, services, privileges, advantages or accommodations.

151. Defendants' actions and practices described above also constitute unlawful discrimination under the various subparts of 42 U.S.C. § 12182(b)(1)(A), including: § 12182(b)(1)(A)(i) (denial of the opportunity to participate in Defendants services); § 12182(b)(1)(A)(ii) (offer of the opportunity to participate in unequal benefits); and § 12182(b)(1)(A)(iii) (provision of separate benefits).

152. Defendants' actions and practices described above also constitute unlawful discrimination under 42 U.S.C. § 12182(b)(1)(E)—discrimination based on association—in that Defendants have discriminated against Plaintiff, by excluding or otherwise denying them, equal goods, services, privileges, advantages, accommodations, or other opportunities because of the known disabilities of the handicapped Plaintiff resident.

153. Such unlawful actions include (1) the Defendants' refusals to offer alternate avenues to keep their residence within the HOA.

154. Rather, to the contrary, Defendant offered no alternatives and instead proceeded directly to foreclosure strictly on the basis of Plaintiff's disability.

155. Defendants' actions and practices described above also constitute unlawful discrimination under 42 U.S.C. § 12182(b)(2)(A)(i), in that Defendants have discriminated against Plaintiff, a handicapped and disabled resident of their properties, through the imposition or application of eligibility criteria that screen out or tend to screen out individuals with a disability (*no alternated alternatives or accommodations if assessments not paid*) from fully and equally enjoying Defendants' goods, services, privileges, advantages.

156. On information and belief, Defendant does not have any actuarial or other such justification for their discriminatory treatment of Plaintiff. Defendants' classifications of risks, with respect to Plaintiffs, were and are not based on sound actuarial principles and were and are not related to actual or reasonably anticipated experience.

157. Simply put, Defendant's do not have any justification on whether Plaintiff could have paid assessments, but instead simply moved to foreclosure unjustifiably.

158. As a result of Defendants' violations of the Americans With Disabilities Act, Plaintiff has been injured, as detailed above in paragraphs 148-158.

## IV. CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS
(Against all Defendants)

159. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

160. Plaintiff cites to 42 U.S.C. § 1985(3), creating liability for conspiracy to interfere with a person's civil rights.

161. To state a cause of action, a Plaintiff must plead that two or more persons conspired with a discriminatory motive.

162. In 1971, in the landmark decision of *Griffin v. Breckenridge*, holding that § 1985(3) allowed for a remedy against private conspiracies.

163. The Griffin Court laid out the elements required to establish a claim under the statute: (1) a conspiracy, (2) a purpose to deprive any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws, (3) an act by one of the conspirators in furtherance of the conspiracy, and (4) a personal injury, injury to property, or a deprivation of any right or privilege of a citizen of the United States.

164. The Court also addressed the scope of the statute's applicability to private actors along two key dimensions. First, the Court held that the private conduct must exhibit an invidiously discriminatory motivation."

165. In particular, to state a claim, a plaintiff must show that the conspiracy was motivated by "some racial, or perhaps otherwise class-based . . . animus."

166. Second, the Court limited the statute's reach by tying it to grants of congressional authority to regulate private conduct.

167. Only in those circumstances in which Congress had the authority to regulate private conduct could the statute be applied constitutionally.

168. In the case at hand, the Congress clearly has the authority to regulate discrimination based on Disabilities as seen in both the Fair Housing Act and the Americans with Disabilities Act.

169. In this case, Plaintiff alleges that all of the board members of MHIII conspired with  Stephane DuPont including Defendants to unlawfully discriminate against Plaintiff based solely on his disability.

170. Defendants conspired together on how to proceed with Plaintiff regarding his unpaid HOA fees.

171. Defendants' purpose in conspiring was to deprive Plaintiff of his equal protection

and privileges under the laws of Colorado.

172. This conspiracy was furthered by Defendants acts of foreclosing on Plaintiff home based on his protected status.

173. This conspiracy was furthered in the fact that Defendants did not allow reasonable modifications or accommodations for Plaintiff to pay off his HOA fee balance.

174. Defendants also based their decision to foreclose on Plaintiff's house based Mr Dupont's advice about disabled people.

175. As a result of Defendants' actions, Plaintiff suffered injuries as he lost his house based on his disabilities and the facts listed in 159-175.

## V. UNJUST ENRICHMENT
(Against all Defendants)

176. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

177. Under Colorado law, a claim for unjust enrichment has three elements: the defendant received a benefit; at the plaintiff's expense; and, under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation.

178. Defendants improperly foreclosed on Plaintiff house based on his disabilities.

179. Defendants were unjustly enriched at Plaintiff's expense of losing his home because of his disabilities.

180. The attorneys and law firms present in this lawsuit were unjustified in that they forced an unjustified foreclosure which resulted in a gain of over $40,000.00.

181. Such acts and omissions leading to Meadows Hills unjust enrichment were the Actual and proximate cause of harm to Plaintiff.

182. Accordingly, Defendants are liable in damages to Plaintiff in an amount to be proven at trial, arising out of Defendant's unjust enrichment.

183. Injustice can only be avoided by entry of judgment in favor of Plaintiffs and against Defendants.

184. As a result of Defendants' actions, Plaintiff suffered injuries as he lost his house based on his disabilities and the facts listed in 176-184.

## VI. SELECTIVE ENFORCEMENT
(Against All Defendants)

185.  Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

186. The policy outlining foreclosure is "collection policy and procedure" states as follows:

**Judicial Foreclosure**. The Board may choose to foreclose on the Association's lien in lien of or in addition to suing an Owner in county court for a money judgment. The purpose of foreclosing is to obtain payment of all assessments owing in situations where either a money judgment lawsuit has been or is likely to be unsuccessful in obtaining payment, or other circumstances favor such action **"may choose"** (*to Foreclose*) "in lieu of" a money.

187.  A homeowners' association has the duty to enforce the covenants of a community in a procedurally fair and reasonable manner.

188.  When a homeowners' association board breaches this duty, the homeowner is entitled to the defense of selective enforcement against the HOA.

189.  As set forth in the above facts, MHIII has not enforced their covenants in a procedurally fair and/or reasonable manner.

190.  When an Association acts arbitrarily by enforcing the same covenant differently against one owner and another, typically choosing to enforce against one owner but not others.

191.  MHIII has chosen to selectively enforce Judicial Foreclosure against Plaintiff because he is disabled.

192.  MHIII has significantly departed from their usual actions in this scenario as described above.

193.  MHIII selectively barred Plaintiff from entering into a payment agreement or modification of HOA fee plan to keep his house.

194.  As a result of Defendants' selective enforcement, Plaintiff has sustained damages to be determined at trial, as listed in the facts of Paragraphs 185-194.

## VII. QUID PRO QUO AND HOSTILE ENVIRONMENT HARRASSAMENT

(Against All Defendants)

195.  Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

196. Plaintiff additionally brings a claim against all Defendants under 24 C.F.R. § 100.600.

197. On October 21, 2015, HUD published a lengthy proposed rule titled Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act, 80 FR 63720-63731 (10/21/15).

198. 24 C.F.R. § 100.600 proposes to amend its fair housing regulations to formalize standards for use in investigations and adjudications involving alleged harassment on the basis of race, color, religion, national origin, sex, familial status or disability under the FHA

199. Quid pro quo harassment refers to an unwelcome request or demand to engage in conduct where submission to the request or demand, either explicitly or implicitly, is made a condition related to: The sale, rental or availability of a dwelling; the terms, conditions, or privileges of the sale or rental, or the provision of services or facilities in connection therewith; or the availability, terms, or conditions of a residential real estate-related transaction.

200. Hostile environment harassment refers to unwelcome conduct that is sufficiently severe or pervasive as to interfere with: The availability, sale, rental, or use or enjoyment of a dwelling; the terms, conditions, or privileges of the sale or rental, or the provision or enjoyment of services or facilities in connection therewith; or the availability, terms, or conditions of a residential real estate-related transaction.

201. Factors to be considered to determine whether hostile environment harassment exists include, but are not limited to, the nature of the conduct, the context in which the incident(s) occurred, the severity, scope, frequency, duration, and location of the conduct, and the relationships of the persons involved.

202. A single incident of harassment because of race, color, religion, sex, familial status, national origin, or handicap may constitute a discriminatory housing practice, where the incident is sufficiently severe to create a hostile environment or evidences a quid pro quo.

203. Based on the culmination of Defendants' actions, there is sufficient proof that quid pro quo and a hostile environment was present.

204. Quid Pro Quo and a Hostile Environment is evidenced by the discriminatory housing practice of foreclosure on the Plaintiff, who is disabled.

205. In addition, and upon information and belief, there was only one other incident where foreclosure was initiated due to unpaid assessment, and this included a disabled owner/resident.

206. As a result of Defendants' actions, Plaintiff suffered injuries as he lost his house based on his disabilities and the facts listed in paragraphs 195-206.

## VIII. RESPONDEAT SUPERIOR
(Against WLPP and Alcock Law Firm and Meadow Hills)

207. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

208. For all allegations brought in this Complaint, the actions and omissions of Defendants Wendy Wiegler and  Stephane Dupont and Tammy Alcock and Carol Williams are the actions and omissions of Defendant WLPP, Alcock Law Firm, and MHIII under the doctrines of Respondeat Superior and Vicarious Liability.

209. The actions and omissions of Defendants Wendy Wiegler and  Stephane Dupont and Tammy Alcock are the discriminatory actions as alleged in this complaint that include, but are not limited to:

   (a) harassment of person because of disability.
   (b) threating, coercing, intimidating, and interfering with anyone exercising a fair housing right or assisting others who exercise that right.
   (c) Interfering with Plaintiff's civil rights.
   (d) Failure to make reasonable accommodations and allow reasonable modifications that may be necessary to allow persons with disabilities to enjoy their housing.
   (e) Selective Enforcement of foreclosure due to Plaintiff's disability.
   (f) Creating an Hostile Environment under the Fair Housing Act.
   (g) Failure to explore or offer any alternate avenues for Plaintiff to pay his HOA dues.
   (h) Foreclosure on Plaintiff's house due to his disability.

210. Defendant Tammy Alcock was hired, qualified, supervised, and trained by Defendant Alcock Law Firm.

211. Defendants Wendy Wiegler and  Stephane Dupont was hired, qualified, supervised, and trained by Defendant WLPP.

212. Defendant Carol Williams was hired, qualified, supervised, and trained by Defendant Meadow Hills.

213. Defendant Tammy Alcock, was in the course and scope of employment for

Defendant Alcock Law Firm, is liable in multiple ways, including her selective enforcement and non-efforts to modify or accommodate Plaintiff due to his disability.

214. Defendant Tammy Alcock, was in the course and scope of employment for Defendant Alcock Law Firm, is also liable in multiple ways, including her decision to advise and foreclose on Plaintiff's house due his disability.

215. Defendant Tammy Alcock thereby proximately caused injuries and damages to the Plaintiff, including the loss of his home.

216. As such, the actions and omissions of Defendant Tammy Alcock are the actions and omissions of Defendant Alcock Law Firm under the doctrines of Respondeat Superior and Vicarious Liability.

217. Defendants Wendy Wiegler and Stephane Dupont were in the course and scope of employment for Defendant WLPP, are liable in multiple ways, including their selective enforcement and non-efforts to modify or accommodate Plaintiff due to his disability.

218. Defendants Wendy Wiegler and Stephane Dupont were in the course and scope of employment for Defendant WLPP, are also liable in multiple ways, including to their decision to advise and foreclose on Plaintiff's house due his disability.

219. Defendants Wendy Wiegler and Stephane Dupont thereby proximately caused injuries and damages to the Plaintiff, including the loss of his home.

220. As such, the actions and omissions of Defendants Wendy Wiegler and Stephane Dupont are the actions and omissions of Defendant WLPP under the doctrines of Respondeat Superior and Vicarious Liability.

221. Defendant Carol Williams was in the course and scope of employment for Defendant Meadow Hills, is liable in multiple ways, including her selective enforcement and non-efforts to modify or accommodate Plaintiff due to his disability.

222. Defendant Carol Williams, was in the course and scope of employment for Defendant Meadow Hills, is also liable in multiple ways, including her decision to advise and foreclose on Plaintiff's house due his disability.

223. Defendant Carol Williams thereby proximately caused injuries and damages to the Plaintiff, including the loss of his home.

224. As such, the actions and omissions of Defendant Carol Williams are the actions and omissions of Defendant MHIII under the doctrines of Respondeat Superior and Vicarious Liability.

225. As a result of Defendants' actions, Plaintiff suffered injuries as he lost his house based on his disabilities and the facts listed in paragraphs 207-225.

## IX. DIRECT NEGLIGENCE
(Against Alcock Law, WLPP, and Meadow Hills)

226. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

227. For all allegations brought in this Complaint, the actions and omissions of Defendants Wendy Wiegler and Stephane Dupont and Tammy Alcock and Carol Williams are the actions and omissions of Defendant WLPP, Alcock Law Firm, and MHIII under the doctrines of Respondeat Superior and Vicarious Liability.

228. Defendants Wendy Wiegler was employed by WLPP.

229. Defendant Tammy Alcock was employed by Alcock Law Firm.

230. Defendant Carol Williams was employed by Meadow Hills.

231. Defendants Tammy Alcock, Wendy Wiegler and Stephane Dupont, and Carol Williams were under the direction of Alcock Law Firm, WLPP, and Meadow Hills.

232. Defendants Alcock Law Firm, WLPP, and Meadow Hills, their agents, servants, and employees were negligent with respect to the in the hiring, training, and supervision of Tammy Alcock, Wendy Wiegler, Dupont and Carol Williams.

233. As a direct and proximate result of the negligence of Alcock Law Firm, WLPP, and Meadow Hills, its agents, servants, and employees, the plaintiff was caused to suffer severe damages, including the loss of his home due to his disability.

234. As a result of Defendants' actions, Plaintiff suffered injuries as he lost his house based on his disabilities and the facts listed in 226-234.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues so triable as of right.

**WHEREFORE**, plaintiff respectfully prays that the Court grant them the following relief:

**(1)**    As a result of Defendant MHIII and Carol Williams' Breach of Fiduciary Duties, Plaintiff has suffered damages.

**(2)**     As a result of Defendants' violations of the Fair Housing Act, 42 U.S.C. § 3604 et seq., Plaintiff has suffered damages.

**(3)**     As a result of Defendants' violations of the Americans With Disabilities Act, 42 U.S.C. § 12182(a), Plaintiff has suffered damages.

**(4)**     As a result of Defendant's violations of 42 U.S.C. § 1985(3), Plaintiff has suffered damages.

**(5)**     Defendants have all gained unjust enrichment based on their unlawful and discriminatory actions.

**(6)**     Enter a declaratory judgment finding that the foregoing actions of the defendants violate the Fair Housing Act, 42 U.S.C. § 3604 et seq.

**(7)**     Enter a declaratory judgment finding that the foregoing actions of the defendants violate the American with Disabilities Act, 42 U.S.C. § 12182(a).

**(8)**     Enter a declaratory judgment finding that the foregoing actions of the defendants violate the Fair Housing Act, 42 U.S.C. § 3604 et seq.

**(9)**     Enter a declaratory judgment finding that the foregoing actions of the defendants violate 42 U.S.C. § 1985(3).

**(10)**     Enter a declaratory judgment finding that Alcock Law, WLPP, and Meadow Hills are liable through Respondeat Superior and Vicarious Liability.

**(11)**     Enter a declaratory judgment finding that Alcock Law, WLPP, and Meadow Hills are directly negligent.

**(12)**     enter a permanent injunction directing the defendants and their directors, officers, agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

**(13)**     award compensatory damages to plaintiffs in an amount to be determined by the jury that would fully compensate plaintiffs for the economic loss, humiliation, embarrassment and emotional distress that has been caused by the conduct of the defendants alleged herein;

**(14)**     award plaintiffs their reasonable attorneys' fees and costs.


**(15)**     order such other relief as this Court deems just and equitable.

Respectfully Submitted this May 28, 2020.

                                    **ROBINSON & HENRY, P.C.**

                                    By: */s/ Robert R. Harper* _____
                                    Robert Harper, Esq. #48454
                                    *Attorney for Plaintiff*

***Pursuant to C.R.C.P. 121, Section 1-26(7) a copy of this document with original or scanned signatures is maintained at the offices of Robinson & Henry, P.C. and will be made available for inspection by other parties or the Court upon request.***