IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 1:20-cv-01524-RBJ

RICHARD WOLF,

      Plaintiff,

v.

MEADOW HILLS III CONDOMINIUM ASSOCIATION,
CAROL WILLIAMS,
STEPHANE DUPONT,
WINZENBURG, LEFF, PURVIS & PAYNE LLP,

      Defendants.

---

## ORDER ON DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS

---

This case is a lawsuit by plaintiff Richard Wolf against Meadow Hills III Condominium Association (the "Association"); former Association board member Carol Williams, and attorney defendants that include Winzenburg, Leff, Purvis & Payne LLP ("WLPP") and former WLPP attorney Stephane Dupont.  Before the Court are a motion for judgment on the pleadings with prejudice by the attorney defendants and a similar motion by the Association and Ms. Williams. For the reasons stated below, those motions are DENIED IN PART and GRANTED IN PART.

## I.    BACKGROUND

Mr. Wolf is physically and mentally disabled.  He suffers from diabetes, numerous forms of heart disease, and various mental disorders.  ECF No. 9 at ¶¶ 24–29.  His mobility is permanently impaired due to sepsis, atrophy in both legs, and partial amputations of his left foot. *Id.*  He has received social security disability income (SSDI) since 2013. *Id.*  In 2013, Mr. Wolf purchased condominium unit #C at 4094 South Carson Street, Aurora, Colorado 80014 (the

"condo" or "unit"). *Id.* He had numerous disputes with the Association. In 2018 he sold the unit and moved out.

### A. Initial Dispute & Collection Attempt

Mr. Wolf's dispute with the Association began in November 2015, when his condo flooded. ECF No. 9 at ¶40. The parties disagreed about financial responsibility for the damages, which Mr. Wolf calculated at $5,700. Mr. Wolf withheld that amount from his Association fees, and the Association sued Mr. Wolf in Arapahoe County Court to collect the unpaid assessments. *Id.* at ¶¶40–49. The Association's board (the "board") voted to continue with the county court action on September 8, 2016. *Id.* at ¶53. Trial was set for November 30, 2016. *Id.* at ¶52.

### B. Foreclosure, Bankruptcy, Discrimination Complaint, & the First Stipulation

Shortly before trial, the Association changed tack. The board authorized foreclosure on November 4, 2016, filed a foreclosure action in Arapahoe County District Court on November 7, and consolidated the money damages case into the foreclosure action. *Id.* at ¶¶68–69; ECF No. 47 ¶2. According to Mr. Wolf, the Association's decision to abandon the civil case was a response to its discovery of his disability. The complaint alleges that the Association "discovered" Mr. Wolf's reliance on SSDI when he requested a waiver of filing fees in the Association's case seeking a monetary judgment. ECF No. 9 ¶¶56. Only after this discovery, says the complaint, did the Association and its lawyers begin discussing possible foreclosure. *Id.* at ¶59.

Mr. Wolf claims that the Association's decision to abandon its pursuit of a monetary judgment in favor of foreclosure was atypical—the Association normally collected debts through monetary judgments and foreclosed only as a last resort. *Id.* at ¶8. The Association's law firm, however, made it a standard practice to immediately initiate foreclosure proceedings upon discovering that a debtor had disabilities. *See id.* at ¶¶7–9, 59–66. This alleged targeting of

disabled individuals for foreclosure because of their disabilities forms the basis of plaintiff's complaint against the law firm, which is a defendant in this case. *See id.* Plaintiff alleges that he learned of the law firm's practice from a blog post that "indirectly advised associations to foreclose on the disabled." *Id.* at ¶83. This post,[1] entitled "Five Delinquent Homeowners You Will Meet in Court (and One You Won't)," described individuals who are "retired and/or on disability" as "believ[ing] they are 'judgment proof.'" *Id.* It encouraged associations to foreclose on judgment liens in order to collect payment. *Id.* The complaint alleges that the Association and its lawyers followed the playbook laid out by the blog post: they assumed that Mr. Wolf had no assets because he received SSDI and jumped immediately to foreclosure proceedings.[2] Had Mr. Wolf been able-bodied, the complaint alleges, the Association would have sought compensation through a monetary judgment.

Mr. Wolf fought back. He filed for bankruptcy on November 11, 2016, four days after initiation of foreclosure proceedings, and the foreclosure case was stayed on November 19. *Id.* at ¶¶72–73. He also filed a housing discrimination complaint with the Colorado Civil Rights Division (CCRD). ECF 22-4. The CCRD complaint claimed that the Association chose to initiate foreclosure proceedings against Mr. Wolf only because he was disabled. *Id.* at p.3. As evidence, the discrimination complaint alleged that the Association had treated other homeowners with lien histories similar to plaintiff's more favorably—they had pursued monetary liens. *Id.* at p.3.

---

[1] The blog post has been deleted but is available at
http://web.archive.org/web/20151007020537/http://www.cohoalaw.com:80/money-matters-five-delinquent-homeowners-you-will-meet-in-court-and-one-you-wont.html.

[2] Plaintiff claims that he actually had sufficient assets to pay the monetary lien, so the case would not have ended in foreclosure had the Association followed it usual practices. *See* ECF No. 9 at ¶44. Even if he were assetless, he would still have a cognizable claim of receiving disparate treatment because of his disabled status.

The parties mutually agreed to resolve all disputes through a stipulation filed with the bankruptcy court on June 23, 2017 (the first stipulation).  ECF No. 22-1.  Under the first stipulation, Mr. Wolf agreed to (1) sell his residence within 75 days; (2) pay the Association $5,000 from the sale; (3) provide the Association a general release of all claims; (4) retract his CCRD complaint.  *Id.* at p.2.  The Association promised to take down the blog post within 10 days of the stipulation's execution and represented that the $5,000 payment would constitute payment in full of all amounts owed the Association.  ECF No. 22-1 at p.2.

The first stipulation was only partially fulfilled.  Mr. Wolf, as directed by the stipulation, provided the Association a general release of all claims, ECF No. 22-2, and withdrew his housing discrimination complaint, ECF No. 22-5.  The Association did not remove the blog post within 10 days of the first stipulation.  *See* ECF No. 9 ¶84.  Mr. Wolf did not sell his home within 75 days of the first stipulation and the Association therefore did not collect $5,000 from the sale.

### C.  Parking Accommodation

A few months after the first stipulation, Mr. Wolf and the Association had a conflict over a parking accommodation request. An antibiotic-resistant bacteria infected Mr. Wolf's left foot in September 2017.  ECF No. 9 ¶85.  He was hospitalized for two months, during which time he was "strictly isolated, sedated, often psychotic and catatonic, and completely unable to respond in any meaningful way." *Id.*  He was released with a delicate skin graft and instructions to strictly limit walking.  *Id.* at ¶86.  He requested an assigned parking spot near his unit on October 4, 2017.  *Id.* at ¶88.  The Association approved his request about six weeks later but did not "implement" the request by erecting a sign until months later.  *Id.* at ¶¶90, 145.  In the interim, Mr. Wolf slipped on ice trying to cross the parking lot to his car, injured the sensitive skin graft, and ultimately had to have his big toe amputated.  *Id.* at ¶¶93–97.  Mr. Wolf claims the

Association delayed approving and then implementing his parking accommodation in retaliation for Mr. Wolf's complaints against the Association. *Id.* at ¶¶92, 147.

### D. **The Second Stipulation**

As the parking conflict neared its resolution in January 2018, Mr. Wolf, believing the Association had violated the first stipulation, filed a motion in the bankruptcy court to determine the validity of the secured lien. *See* ECF No. 22-3 ¶9. The parties again tried to mutually resolve all disputes through a stipulation (the second stipulation) filed March 13, 2018. ECF No. 22-3. The second stipulation began by acknowledging that the first stipulation "was not entirely fulfilled." *Id.* at ¶9. It next imposed familiar obligations on Mr. Wolf. He agreed to (1) sell his residence within 120 days; and (2) pay the Association $9,000 from the sale (up from $5,000). *Id.* at ¶11. The second stipulation "revive[d] and re-assert[ed] the general release provided by Mr. Wolf pursuant to the first stipulation. *Id.* at ¶12. Mr. Wolf also promised to withdraw his CCRD complaint (which he had done months earlier) and "agree[d] that the Association has not conducted itself in a discriminatory fashion with respect to [his] request for a reasonable accommodation in the form of a parking space." *Id.* at ¶13. The Association represented that it had taken down the blog post and guaranteed that the $9,000 payment would constitute payment in full of all amounts owed the Association. *Id.* at ¶¶11, 13. The second stipulation specified that in the event of a breach, the non-defaulting party would be able to enforce the terms of the stipulation. *Id.* at ¶16. It also said that Mr. Wolf would be responsible for post-petition legal fees that resulted from "any default of this Stipulation caused by [Mr. Wolf]." *Id.* at ¶17. Pursuant to the second stipulation, the bankruptcy case was dismissed on April 30, 2018.

The second stipulation was no more effective than the first. On May 18, only 66 days after the second stipulation, Mr. Wolf informed the Association that the second stipulation "had been breached and was no longer in place." ECF No. 56-2 at p.2. The exact breach is unclear.

Evidence of the breach and Mr. Wolf's notification come from a September 27, 2018 filing from the Association opposing a request by Mr. Wolf to have the lien expunged by the Arapahoe County District Court.  *See* ECF No. 56-2.  In that filing, the Association assiduously avoided mentioning who breached the second stipulation or how. [3]  But it noted that the Association "accepted Wolf's termination of the [second] Stipulation" and repeatedly asserted that the second stipulation was no longer in effect.  *Id.* at p.2; *see also id.* at p.3 ("When Wolf rescinded the Stipulation and Plaintiff accepted the rescission, the rights and remedies under the Stipulation became void."); *id.* at p.4 ("[A]s stated above, the [second] Stipulation was breached and subsequently terminated.").  In any case, the Association no longer believed itself bound by the second stipulation and reinstated the foreclosure action in June 2018.

### E.   The Second Discrimination Complaint & Sale of the Unit

Mr. Wolf filed a second discrimination claim with the CCRD on February 20, 2019.  He alleged that the Association had failed to make reasonable accommodations (the parking spot), imposed unfavorable terms on his tenancy, coerced him into signing the second stipulation, made housing unavailable, and retaliated against him.  *See* ECF No. 47-1 pp.4–7.  The CCRD found insufficient evidence to support his claims.  *Id.*

Mr. Wolf claims that, during the course of the dispute, he tried three times to pay the $5,700 he owed the Association, but each time the Association refused payment.  ECF No. 9

---

[3] Mr. Wolf could not have breached by failing to sell his condo—on May 18, when he notified the Association that the second stipulation had been breached, he still had 54 days to sell.  He could not have breached by failing to either rescind his CCRD complaint or granting the Association a general release—he had already done both.  Now, in his response to defendants' motions for judgment on the pleadings, Mr. Wolf claims that the Association breached the second stipulation by adding additional attorney costs and fees to the claimed lien amount instead of reducing the amount of the lien.  ECF No. 56 at p. 2.  The pleadings do not reveal whether this was the breach Mr. Wolf identified on May 18, 2018.

¶45.  Mr. Wolf sold his condo on September 9, 2019.  ECF No. 56-1.  The Association collected over $36,000 from the sale.  *Id.*

Mr. Wolf filed this case on May 28, 2020.  ECF No. 1.  His amended complaint asserts seven claims against the Association, Ms. Williams, WLPP, and Mr. Dupont: (1) conspiracy to interfere with civil rights; (2) violation of the Fair Housing Act (FHA); (3) failure to accommodate; (4) breach of fiduciary duty; (5) breach of the statutory obligation of good faith; (6) breach of the implied covenant of good faith and fair dealing; and (7) aiding and abetting a breach of fiduciary duty.  ECF No. 9 ¶¶101–80.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) authorizes a motion for judgment on the pleadings after the pleadings are closed but early enough not to delay trial.  A motion for judgment on the pleadings is subject to the same standard as a 12(b)(6) motion to dismiss.  *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1302 (10th Cir. 2021).  To survive a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* at 1303 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted)).  All reasonable inferences from the pleadings are granted in favor of the non-moving party.  *Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1141 (10th Cir. 2012).  Judgment on the pleadings is appropriate when "the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law."  *Id.*

## III.    ANALYSIS

### A.  Plaintiff's Allegations

Individuals with disabilities are entitled to the full bevvy of rights bestowed upon all humankind and protected by our Constitution and laws.  However, "census data, national polls,

and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally." 42 U.S.C. § 1201(a). "[T]he continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous." *Id.*

Before diving into the factual and legal intricacies of this specific case, I want to outline plaintiff's allegations. Plaintiff's story is muddled by lengthy litigation, legal jargon, pro-se filings, and a revolving door of plaintiff attorneys, but once the pieces of the complaint are arranged clearly, they paint a troubling picture. The heart of the allegation is identification of a pernicious practice of discrimination against individuals with disabilities. Plaintiff claims that his injuries and defendants' alleged conduct are merely a single exercise of a regular discriminatory pattern. Most troubling is the implication that this well-rehearsed method of discrimination, if it exists, may be cleverly designed to circumvent judicial scrutiny.

I want to be clear, however, that the complaint's allegations are just allegations. Plaintiff remains obligated to substantiate his claims. Only time will tell whether plaintiff's claims are true, but for the purposes of this order I must assume the veracity of plaintiff's claims. But I bear in mind that allegations and accusations are a dime a dozen. This order is not a finding of wrongdoing by any defendants, and my articulation of plaintiff's story is not in any way a confirmation of its truth.

Plaintiff identifies an alleged practice of discriminating against individuals with disabilities by wrongfully pushing them to the brink of homelessness and then exploiting the dangerous consequences of the wrongdoer's illegal actions to deny those disabled individuals an

avenue to vindicate their rights.  According to the complaint, the practice begins with disparate treatment: foreclosing on the homes of individuals with disabilities because of their disabled status.  Homeowners' associations (HOAs) generally collect unpaid dues and fees through monetary judgments executed through wage garnishment.  A wrongdoer HOA would proceed— or a wrongdoer attorney would advise his or her client to proceed—with the usual monetary judgment against an able-bodied debtor.  Disability income, however, is not subject to garnishment, so the wrongdoers would take a different approach with disabled debtors: immediate foreclosure.  This disparate treatment—foreclosure as a first-resort for disabled debtors—likely violates any number of constitutional and statutory anti-discrimination laws.  But the victims of such discrimination find themselves staring down the barrel of imminent homelessness, a condition particularly dangerous for individuals with disabilities.  If a disabled person complains to anti-discrimination authorities, the wrongdoer HOA or attorney would, having illegally put the disabled individual in a mortal bind, insulate themselves from liability. They would offer a deal: the HOA will permit the disabled individual to sell their home on a slightly longer timeframe, thus averting the worst effects of sudden homelessness, in exchange for a waiver and release of all discrimination claims.

This practice—if it exists—would be particularly worrisome because of its likelihood to deny any remedy to victims of disability-based discrimination.  This inability to remedy discrimination would undermine numerous statutes designed specifically to create legal remedies for such violations.  *See, e.g.* Americans With Disabilities Act, 42 U.S.C. § 12101 (establishing the statute's purpose as outlawing and enforcing the prohibition on disability-based discrimination); Fair Housing Amendments Act, Pub. L. No. 100-430 (1988) (extending the

Civil Rights Act of 1964 to cover housing discrimination due to disabled status); 42 U.S.C. §§ 1983, 1985 (creating private causes of action to enforce denial of federal constitutional rights).

Such a remedial lacuna cries for equity, which "will not suffer a wrong to be without a remedy." 27A Am. Jur. 2d Equity § 6. American courts have a long history of finding or creating flexibility in otherwise-rigid judicial doctrines to ensure the vitality of this equitable maxim. *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 169 (2016) (explaining that courts will hear some cases that would otherwise fall outside of the Article III "Cases" and "Controversies" requirement if the disputes are "capable of repetition yet evading review"); *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) (finding an implied cause of action because of the importance of the right violated and the inability to vindicate that right through other means); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) (where there is a legal right there must be a remedy). In addition to possibly curing an otherwise-unassailable wrong, exercising equitable powers in this case will discharge "the duty of the judicial department to say what the law is." *Marbury*, 5 U.S. at 177. Given the cleverness of this alleged scheme, such an opportunity may not arise again.

Finally, I reemphasize that allegations are just allegations. There is a long road to proof.

**B.  <u>Timeliness</u>**

Rule 12(c) permits motions for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). Plaintiff argues that defendants' motions are untimely because they would delay the trial, currently set for May 2022, by delaying discovery. ECF No. 56 at pp.4–5. I disagree. The motions were filed on June 23, 2021, shortly after the Court explicitly authorized their filing and eleven months before trial. ECF No. 45; *see also* ECF Nos. 46, 47. I find they would not delay trial and are therefore timely.

### C.  First Claim—§1985 Conspiracy to Interfere with Civil Rights

Plaintiff brings his conspiracy claim under 42 U.S.C. § 1985(3), which creates a cause of action against individuals who conspire to directly or indirectly deprive an individual of the equal protection of the laws.  Alleging a § 1985 conspiracy requires a plaintiff "allege specific facts showing an agreement and concerted action amongst the defendants."  *Brooks v. Gaenzle*, 614 F.3d 1213, 1228 (10th Cir. 2010), *abrogated on other grounds by Torres v. Madrid*, 141 S. Ct. 989 (2021) (internal citation omitted).  Mr. Wolf alleges that the Association, the board, defendant Williams, defendant DuPont, and WLPP conspired to discriminate against him based on his disability.  ECF No. 9 at ¶105.  He alleges that defendants collectively planned how to proceed against plaintiff and then foreclosed on his home and denied him accommodations because of his disabled status.  *Id.* at ¶¶ 108–11.

Defendants claim entitlement to judgment as a matter of law for three independent reasons: First, Mr. Wolf waived his right to bring a conspiracy claim.  Second, the claim is barred by the statute of limitations.  Third, the attorney defendants cannot, as a matter of law, be held liable for conspiring with their clients in this case.

### 1.  Waiver

Defendants argue that Mr. Wolf thrice released the claims giving rise to this lawsuit.  *See* ECF No. 47 at p. 6.  Defendants point first to the general release of claims signed by Mr. Wolf pursuant to the first stipulation.  That release relinquished not only claims asserted in Arapahoe County District Court and with the CCRD—which were substantially similar to the claims asserted here—but also "all Claims" against defendants, "whether known or unknown, latent or pending . . . ."  ECF No. 22-2.  Defendants next identify Mr. Wolf's withdrawal of his first CCRD complaint.  His signed CCRD withdrawal form included his attestation that, "I understand that I may not pursue this matter further, through any administrative or judicial

process." ECF No. 22-5.  Lastly, defendants argue that Mr. Wolf released his claims by signing the second stipulation.  That stipulation contained both a "reviv[al] and reassert[ion]" of the general release and a specific admission that "[Meadow Hills] has not conducted itself in a discriminatory fashion with respect to [Plaintiff's] request for reasonable accommodation the form of a parking space."  ECF No. 22-3 at ¶¶12, 13.

In isolation, these releases might appear valid and therefore dispositive.  But the releases were not granted in isolation but as part of a bargained-for exchange.  Mr. Wolf signed the general release and withdrew his CCRD complaint—waiver included—as part of the first stipulation.  *See* ECF No. 22-1.  He revived the general release, re-agreed to withdraw the CCRD complaint, and waived parking-related complaints as part of the second stipulation.  *See* ECF No. 22-3.  In exchange for his releases, Mr. Wolf was promised relief from all debts owed the Association for a sum certain, removal of the offensive blog post, and an end to the foreclosure action.  *See id.* at ¶¶11, 13.  The stipulations are thus valid contracts under Colorado law.

At some point, the second stipulation was breached.  Thus, the question before this Court is whether liability waivers granted as part of a contractual exchange remain valid when the contract is breached.  If defendants breached the contract, Colorado law is clear that they cannot enforce the liability waivers.  *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1273–74 (10th Cir. 2018) ("Under [Colorado] contract law, a party to a contract cannot claim its benefit where he is the first to violate its terms." (quoting *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo. 2005)) (alterations in original)).  Because Mr. Wolf alleges that defendants breached the contract, I cannot conclude at this stage of litigation that his waivers are valid and enforceable.  However, even if plaintiff was the first to breach the contract, defendants' alleged subsequent conduct would preclude them from enforcing the waivers.  If Mr. Wolf breached the

contract, the Association, as the non-breaching party, would have had two options: First, it could have terminated or sought rescission of the contract, in which case it would have been relieved form its future performance obligations.  Alternatively, it could have affirmed the contract and continued with both sides' performance obligations.  But it could *not* have had its cake and eaten it too—it could not both decline to perform its own contractual obligations and yet hold the other party to its contractual obligations.  *Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA), Inc.*, 958 F. Supp. 2d 1238, 1244 (D. Colo. 2013) (citing various Colorado state court cases).  As plaintiff points out, the Association considered itself freed from contractual obligations.  Despite the second stipulation's establishing that $9,000 from the sale of Mr. Wolf's condo would constitute payment in full to the Association, the Association collected over $36,000 from the sale.  ECF No. 56-1.[4]  Having denied Mr. Wolf the valuable consideration it promised—release of debt for a sum certain—the Association cannot retain the thing of value granted it by Mr. Wolf—the releases of claims.  I therefore hold that the record does not establish that the waivers are valid and enforceable.

2. Statute of Limitations

Defendants next argue that Mr. Wolf's § 1985 claims are time-barred.  The parties agree that a two-year statute of limitations applies, and that the last actionable date was May 28, 2018.  *See* ECF Nos. 47 at p. 8; 56 at p. 7.  Defendants contend that the statute began running when defendants decided to foreclose on the condo in November 2016, well before the last actionable date.  Plaintiff responds that the statute did not begin running until April 2019, when document disclosures revealed the proximate connection between the foreclosure decision and the

---

[4] Defendants argue that the second stipulation was not rescinded but that a defendant lawyer had mixed up legal concepts in a court filing.  ECF No. 56 at p. 6.  Whatever language was used, the record contains sufficient evidence that defendant did not consider itself bound by the contract.

association's discovery of Mr. Wolf's disability.  Defendants dispute that Mr. Wolf learned

anything new from the April 2019 disclosures.  They point out that Mr. Wolf had made

substantially identical allegations in his May 2017 CCRD complaint.

Mr. Wolf cannot plausibly claim that he "could not have known the decision to foreclose

was based on his disability" until the 2019 disclosures.  His first CCRD complaint alleging this

exact discrimination shows that, at the very least, Mr. Wolf had a strong suspicion as early as

2017.  His best argument is that his suspicion was not confirmed until the 2019 disclosures

revealed the content of the attorney defendants' advice to their clients.[5]  This is a close question.

Individuals subject to discrimination often intuit and can identify discriminatory motives before

they have concrete proof.  That Mr. Wolf filed a CCRD complaint based on intuition and

suspicion—which he claims were later confirmed—should not be a strike against him.  At the

same time, however, the 2017 CCRD complaint make it difficult to accept Mr. Wolf's theory of

when the statute of limitations began to run.

At this stage, Mr. Wolf's claims are saved by the doctrine of equitable tolling.  *See* ECF

No. 56 at pp. 10–11.[6]  Equitable tolling may extend a statute of limitations when (1) a litigant

diligently pursued his rights; and (2) some extraordinary circumstance stood in his way.

*Lawrence v. Florida*, 549 U.S. 327, 336 (2007).  "The diligence required for equitable tolling

purposes is 'reasonable diligence,' not 'maximum feasible diligence.'"  *Holland v. Florida*, 560

U.S. 631, 653 (2010) (internal citations and quotations omitted).  Although courts of equity

exercise judgment in light of prior precedent," they must maintain "awareness of the fact that

---

[5] Mr. Wolf claims that the attorney defendants' "billing records . . . revealed that . . . [attorney defendants] began advising the Association on foreclosure options, only after discovery of Plaintiff Wolf's disability and protected status on or about June 29, 2016."  ECF No. 9 at ¶59.

[6] My decision to exercise equitable powers is based in-part upon specific factual allegations in the complaint that I must accept at this stage of litigation.  If discovery does not substantiate these facts, I may revisit my decision to apply the doctrine of equitable tolling.

specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case." *Id.* at 650.  Mr. Wolf's § 1985 claim, for which the statute of limitations is provided by Colorado law, may be subject to Colorado law's even more flexible standards for equitable tolling.  *See Donoghue v. Cnty. of Orange*, 848 F.2d 926, 930 (9th Cir. 1987) ("The [Supreme] Court has also indicated that state law doctrines allowing for tolling may be applicable to [civil rights causes of action].").  Rather than a two-part test, Colorado courts inquire whether the particular circumstances of a case require a court to exercise its equitable powers, the goal of which is "to promote and achieve justice with some degree of flexibility." *Garrett v. Arrowhead Imp. Ass'n*, 826 P.2d 850, 855 (Colo. 1992).  Equitable tolling applies in Colorado when, for example, a party fails to fulfil a statutory obligation, and that failure causes the delay in filing.  *Shell W. E&P, Inc. v. Dolores Cnty. Bd. of Comm'rs*, 948 P.2d 1002, 1010 (Colo. 1997).  Equitable tolling will apply in such a circumstance even without a claim of bad faith.  *Id.*

I find that the complaint alleges sufficient facts to invoke both the federal and state equitable tolling doctrines.  Under the federal two-part test, Mr. Wolf exercised reasonable diligence in pursuing his rights by filing discrimination complaints, a bankruptcy action, and juggling litigation in multiple cases while trying to avoid sudden eviction from his home.  Mr. Wolf was prevented from filing this action by extraordinary circumstances: incapacitating health issues, imminent homelessness, and, most importantly, the aforementioned alleged scheme of indemnification against discrimination complaints.  Under the state doctrine, the complaint alleges that defendants' delay in providing disclosures prevented Mr. Wolf from filing his federal case.  Plaintiff alleges that defendants did not fulfil their statutory obligation to make timely disclosures and that this delay caused Mr. Wolf to wait on filing his federal complaint.  *See* ECF

56 pp.8–9.  That Mr. Wolf had, before receiving late disclosed materials, filed a similar CCRD complaint—a different proceeding with different burdens and standards—does not undermine his claim that he would have filed a federal lawsuit within the statute of limitations period if not for defendants' untimely disclosures.  The statute of limitations does not bar his claim at this stage of litigation.

> 3.   <u>Attorney Defendants</u>

The attorney defendants argue that they cannot be liable for conspiracy in this case.  An attorney, as an agent of his or her principal, may not be held liable for conspiracy client so long as they (1) acted within the scope of their authority; and (2) did not actively participate in fraud.  *Astarte, Inc. v. Pacific Indus. Sys., Inc.,* 865 F. Supp. 693, 708 (D. Colo. 1994).  Defendant attorneys claim they did nothing beyond advising their client on possible options to secure repayment.  Plaintiff argues that defendant attorneys' advice to their clients was not a one-off instance of advising foreclosure, but perpetuation of the pattern of discrimination outlined above.  I must accept plaintiff's factual allegations at this stage.  If the attorneys were carrying out a practiced program of discrimination, that would be outside of the usual scope of representation.  I therefore decline to dismiss defendant attorneys at this stage.

> **D.  <u>Second/Third Claim—Housing Issue—Violation of the Fair Housing Act</u>**

Plaintiffs bring claims under the Fair Housing Act (FHA), 42 U.S.C. § 3601 *et seq.*, for two incidents: foreclosure based on his disability (the "housing issue") and failure to grant parking accommodations (the "parking issue").  I will deal with FHA claims for the housing issue here and for the parking issue in the next section.  Regarding the housing issue, plaintiff brings two distinct claims: a discrimination claim based on the foreclosure; and a failure to accommodate based on refusal to accept an alternative payment plan.

Defendant does not dispute that plaintiff has made out the elements of his FHA claims but instead advances many of the same arguments for dismissal that they pressed for the conspiracy claim.  My analysis is therefore quite similar.  Defendants may not enforce the waivers given as part of a contract that they either breached or repudiated.  Equitable tolling avoids the statute of limitations.  Here, the alleged scheme improperly denied plaintiff the ability to pursue state discrimination claims which would also have denied him the benefit of tolling FHA claims while a CCRD claim was pending.  *See* 42 U.S.C. § 3613(a)(1)(B) (tolling FHA claims during state administration proceedings).  Finally, while it's true that "[m]ere legal representation of a third party who allegedly violated plaintiff's fair housing rights . . . does not give rise to an actionable claim," *Xiangyuan Zhu v. Fisher, Cavanaugh, Smith & Lemon, P.A.*, 151 F. Supp. 2d 1254, 1259 (D. Kan. 2001), the allegation is that the defendant attorneys implemented a practice of disability discrimination that went beyond mere advice to a specific client.  I therefore decline to grant judgment on the pleadings for defendants FHA claims related to the housing issue.

### E.   Second/Third Claim—Parking Issue—Violation of the Fair Housing Act

Plaintiff also alleges that the Association violated the FHA by denying to reasonably accommodate his disability as required by the Act.  *See* 42 U.S. Code § 3604.  Plaintiff claims that a surgery resulted in a delicate temporary skin graft on his foot that limited his mobility.  When he applied for a reserved parking spot in front of his unit, the Association either denied the request or waited to implement it until too late.  Defendants challenge the sufficiency of factual allegations and argue that the statute of limitations bars the claim.

I find the statute of limitations question dispositive.  The alleged injury—failure to timely approve and implement his request for a reserved parking spot—occurred before the last actionable date.  *See* ECF No. 56 pp. 9–10.  I find that equitable tolling is not appropriate here.

Unlike plaintiff's § 1985 claims, his parking spot-related claims do not rely on evidence that was allegedly untimely disclosed.  *Cf.* ECF No. 9 ¶¶ 53, 59, 75, 76 (citing material disclosed in April 2019 to support allegations of a housing discrimination conspiracy).  And unlike his FHA claims, there is no allegation that denial of the parking accommodation was part of a widespread discriminatory practice designed to avoid judicial sanction.  I therefore find that equitable tolling is unwarranted and grant the motion for judgment on the pleadings as to plaintiffs' parking accommodation claims.

### F.  Fourth Claim—Breach of Fiduciary Duty

Plaintiff brings a claim for breach of fiduciary duty against the Association and Ms. Williams.  ECF No. 9 ¶¶ 150–65.  Defendants respond that neither the Association nor Ms. Williams owed plaintiff a fiduciary duty.  ECF No. 47 pp. 10–11.  I find the complaint insufficiently alleges that the Association or Ms. Williams owed plaintiff a fiduciary duty.  The complaint claims that "[a]s a director of the Association who signed the foreclosure resolution, Carol Williams and the Association owed a fiduciary duty to act in the best interests of the Association and its constitutes, including Plaintiff."  ECF No. 9 ¶ 156.  Defendants respond that, as a matter of law, a non-profit corporation like the Association cannot owe fiduciary duties — such duties are owed by directors, officers, and board members.  *Id.* at p. 10 (citing, inter alia, *Jayhawk Capital Mgmt., LLC v. LSB Indus., Inc.*, 08-2561-EFM, 2012 WL 4210462, at *9 (D. Kan. Sept. 19, 2012)).  Plaintiff does not provide contrary authority.  *See* ECF No. 56 p. 14–15.  Absent legal support for the notion that an Association as a whole can owe fiduciary duties, I find the Amended Complaint's claim that the Association owed fiduciary duties "conclusory and not entitled to be assumed true."  *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

The Amended Complaint alleges that Ms. Williams owed plaintiff a fiduciary duty due to her position as Director of the Association.  ECF No. 9 at ¶ 156.  An HOA Board Member's

duties are governed by the Colorado Common Interest Ownership Act (CCIOA). Colo. Rev. Stat. (CRS) § 38-33.3-100 *et seq.* Section 38-33.3-303(2) establishes two tiers of obligation: HOA board members owe unit owners fiduciary duties if and only if the board members are appointed by HOA declarants. The only exception imposes fiduciary duties "[w]ith regard to the investment of reserve funds of the association." CRS § 38-33.3-303(2.5). In order to properly allege that Ms. Williams owed plaintiff a fiduciary duty, the Amended Complaint would have to allege that Ms. Williams was appointed by plaintiff or that her actions giving rise to the claim involved investment of the Association's reserve funds. The Amended Complaint has not done so. It makes only a general statement that condominium owners often cast ballots. ECF No. 9 at ¶ 151. It therefore fails to allege that either Ms. Williams or the Association owed plaintiff a fiduciary duty, and the motion for judgment on the pleadings is granted as to plaintiff's fourth claim.[7]

### G. Fifth & Sixth Claims—Breach of Good Faith

Plaintiff's fifth and sixth claims allege that Ms. Williams and the Association's actions breached their statutory obligation of good faith (Fifth Claim) and the implied covenant of good faith and fair dealing (Sixth Claim). ECF No. 9 ¶¶ 166–75. Plaintiff alleges that defendants' good-faith obligations stem from the Association's declaration and governing documents. ECF No. 9 at ¶¶ 168, 173.

---

[7] Mr. Wolf also seeks to hold Ms. Williams individually liable for his civil rights, FHA, and good-faith claims. However, the CCIOA establishes personal liability for HOA board members only when they owe fiduciary duties or when they commit "wanton and willful acts and omissions." Colo Rev. Stat. § 38-33.3-303(2)(b); *see also id.* at § 38-33.3-311 (allegations must generally be brought against the Association, not individuals). The Amended Complaint does not allege wanton and willful acts by Ms. Williams—it alleges a single instance of discrimination rather than a pattern. I therefore find that Ms. Williams cannot be held individually liable for any of plaintiff's claims.

The CCIOA establishes that "[e]very contract or duty governed by this article imposes an obligation of good faith in its performance or enforcement." Colo. Rev. Stat. § 38-33.3-113. This includes declarations. *See* ECF No. 47 at p. 11. This obligation displaces the general common law implied duty of good faith and fair dealing. *See* Colo. Rev. Stat. § 38-33.3-319 (expressly preempting any other conflicting Colorado Laws); C.R.S. § 13-80-101 (establishing a different statute of limitations for general contract claims than the two-year statute applied in the CCIOA). Because plaintiff's sixth claim—his common law claim—stems from Association documents governed by the CCIOA, I find that it does not state a cognizable claim.

I find the Amended Complaint sufficient to support its allegation that defendants breached the statutory obligation of good faith. Viewing the Amended Complaint's allegations in the light most favorable to plaintiff, it lists numerous ways that the Association may have acted in bad faith towards plaintiff. These include seeking to avoid its obligations in the stipulations, initiating a foreclosure action, and refusing to accept plaintiff's offers of payment. I further find that the two-year statute of limitations is subject to equitable tolling for the same reasons articulated above.

### H.  Seventh Claim—Aiding & Abetting Breach of Fiduciary Duty

Plaintiff alleges that the Attorney Defendants aided and abetted Ms. Williams and the Association in breaching fiduciary duties owed plaintiff. ECF No. 9 ¶¶ 176–80. Because I found the Amended Complaint insufficient to allege that either Ms. Williams or the Association owed plaintiff a fiduciary duty, I also find it insufficient for the aiding and abetting claim. I therefore grant the motion for judgment on the pleadings as to the seventh claim.

## IV.   ORDER

Defendants' motions for judgment on the pleadings with prejudice (ECF No. 46) and without prejudice (ECF No. 47) are DENIED IN PART and GRANTED IN PART. Specifically:

1. The motions are DENIED as to plaintiff's first claim; and

2. DENIED as to plaintiff's second claim as it relates to the housing issue; and

3. GRANTED as to plaintiff's second claim as it relates to the parking issue; and

4. DENIED as to plaintiff's third claim as it relates to the housing issue; and

5. GRANTED as to plaintiff's third claim as it relates to the parking issue; and

6. GRANTED as to plaintiff's fourth claim; and

7. DENIED as to plaintiff's fifth claim; and

8. GRANTED as to plaintiff's sixth claim; and

9. GRANTED as to plaintiff's seventh claim; and

10. GRANTED as to all claims against defendant Carol Williams.

DATED this 17th day of March, 2022.

BY THE COURT:

_____

R. Brooke Jackson
Senior United States District Judge